**UNITED STATES**

v.

**Don W. ELLIS, 268 54 9261, Private First Class (E–2), U. S. Marine Corps.**

**NCM 76 2257.**

U. S. Navy Court of Military Review.

Sentence Adjudged 21 Nov. 1975.

Decided 14 Feb. 1977.

LT Michael E. Blount, JAGC, USNR, Appellate Defense Counsel.

LT Homer S. Pointer, JAGC, USNR, Appellate Government Counsel.

Before NEWTON, CRANDELL and GLADIS, JJ.

CRANDELL, Judge:

Appellant was tried by military judge alone, sitting as a special court-martial on 14 October 1975, and 4 and 21 November 1975, which was convened by Commanding Officer, Headquarters and Service Battalion, The Basic School, Marine Corps Base, Quantico, Virginia. Appellant was charged with a violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921 (a single specification of larceny of $150.00 in U.S. currency). Contrary to his pleas, he was found guilty of the charge and specification thereunder. The court-martial sentenced appellant to confinement at hard labor for 2 months, forfeiture of $240.00 pay per month for 2 months, reduction to pay grade E–1 and a bad conduct discharge. The convening authority approved the sentence as adjudged, as did the supervisory authority. The case is before this Court in accordance with Article 66, UCMJ.

In his first assignment of error appellant contends:

THE EVIDENCE OF RECORD FAILS TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT COMMITTED THE CHARGED OFFENSE.

▮ Appellant was charged with stealing $150.00 in United States currency from the locker of a fellow Marine. The government attempted to prove appellant's guilt through circumstantial evidence which, appellant asserts, failed to sufficiently link appellant with the incident to justify conviction. The testimony of Lance Corporal S, the alleged victim, indicated that he had placed $150.00 in U.S. currency on the top shelf of his locker at 2400 hours on the night of 15 July 1975. (R. 12). Upon returning after duty on the morning of 16 July 1975, both he and another roommate, one Lance Corporal L, noticed that their money was missing. Appellant's locker was subsequently searched and $150.00 was found inside a sock. (R. 30). The government further introduced evidence that appellant could not be located for approximately 45 minutes during his watch in the early morning hours of 16 July 1975. The government contends that the coincidence of the $150.00 in appellant's possession together with the other evidence on record is sufficient to prove guilt beyond a reasonable doubt. Appellant disagrees and offers an explanation of the government's evidence.

Appellant explained the origin of the $150.00 in his possession through testimony from two others. (R. 52–65). He had been paid on the morning of 15 July 1975 and,

thereafter, deposited $68.00 of the $137.00 he had received into his account at the Credit Union. (R. 50). Corporal M testified that he had paid appellant $20.00 on 15 July 1975 (R. 43); and, Lance Corporal C testified that the appellant had won "in the neighborhood of $70" from him in a poker game on the night preceding the theft. (R. 48). Appellant's theory is that, taking the $69.00 remaining from appellant's paycheck, the $20.00 from Corporal M and assuming that he received $75.00 from Lance Corporal C, appellant would have possessed $164.00 on the night of 15 July 1975 and the following morning. Sergeant C, a criminal investigator, testified that appellant had $14.00 on his person and $150.00 in his locker. (R. 30). This is the exact figure that would have been expected according to appellant. Upon this basis, appellant claims he has explained the possession of money by him shortly after the larceny and also explained the coincidence of it being in the denominations claimed stolen—seven twenty-dollar bills and a ten-dollar bill.

Appellant asserts that several items create reasonable doubt in the prosecution's case of circumstantial evidence, such as his explanation of the origin of the money found in his possession, the Government's inability to account for appellant's own money in addition to that stolen from Lance Corporal L, and the alleged changing of the amount reported stolen by the victim after the recovery of a different amount from the appellant. Appellant contends that his explanation of the origin of the $150.00 in cash Sergeant C found in his locker, corroborated by witnesses, casts reasonable doubt on his guilt. However, the victim, Lance Corporal S, suffered the loss of seven twenty-dollar bills and one ten-dollar bill, and that is exactly what was found in appellant's locker. (R. 12, 30). Appellant explains away this coincidence by claiming that: part of the money was the balance of his pay after depositing some of it in the credit union; another part of it he won gambling; and the last part of it was partial repayment for a loan. The Government, on the other hand, asserts that his explanation depends for corroboration upon the testimony of two defense witnesses who are unworthy of belief. The Government asserts that one of them, C, who testified to losing $65 to $70 to appellant in a poker game, would not be believed, even under oath, by his platoon sergeant. (R. 71). We also note that the platoon sergeant testified that he would not believe the appellant under oath either. (R. 70). The other witness, Corporal M, had some difficulty initially in identifying the date on which he supposedly repaid appellant twenty dollars.

We find appellant's explanation of his possession of $150.00, the amount lost by the victim, not to be credible. Appellant, when initially confronted by the Criminal Investigator, claimed he had only $14.00, which was comprised of a ten-dollar bill and four one-dollar bills. Later, when his effects were searched, $150.00 was found in one of his socks. This money consisted of seven twenty-dollar bills and one ten-dollar bill, the exact amount and in the exact denominations as the money lost by the victim, Lance Corporal S. Appellant's explanation of why he denied having more than the $14.00 originally found on him is not worthy of belief. Appellant claims that he did not want to admit having more money than $14.00 because he might be suspected of gambling. This does not ring true. A private first class having $164.00 the day after payday would not be such an unusual circumstance as to arouse suspicion that such person had won the money gambling. Appellant knew he was suspected of stealing $150.00 from a barracks mate, a most serious offense in any society, and one which, of necessity, cannot be tolerated in a military society. Appellant also knew that, although gambling in the barracks was a violation of regulations, it was certainly not as serious an offense as stealing money from a fellow Marine. He knew that then and he knew that at the trial where, indeed, he invoked the gambling as an explanation for the possession of the additional $150.00. Appellant's denial of having money when initially confronted by the criminal investigator, Sergeant C, is consistent with a consciousness of guilt and an attempt to

conceal a theft. Appellant's explanation of the reason for taking action consistent with a consciousness of guilt is not worthy of belief.

Another aspect of appellant's attack on the sufficiency of the evidence is his allegation that the victim, Lance Corporal S, originally reported his loss at $160.00 (R. 19) and that it was only after Sergeant C found $150.00 in appellant's locker that Lance Corporal S gave a statement changing the amount to $150.00. (R. 19). To the contrary, the record discloses that while Lance Corporal S originally reported a loss of $160.00, he opened a drawer containing some $10.00 in change which he had initially believed stolen and remembered the bills he had put into his boot amounted to only $150.00, prior to Sergeant C's search of appellant's locker. (R. 19, 23–24).

Q. I said, what did you tell Sergeant C . . . as to how much money was taken?

A. I told him $150.

Q. Why did you tell him 150 rather than 160?

A. Because I found the coins. When I opened the wall locker up and checked and went back downstairs and reported it, I forgot that I had the coins.

Q. So when you first reported it, you reported $150?

A. No, sir; 160 when I first reported it.

Q. Okay. What did you tell Sergeant C . . . ., though?

A. Then when he got up there—I opened the wall locker <u>before he got there</u> and opened the drawer and I seen the coins. And when he got there he wanted a statement, too, so I wrote the statement for 150.

Q. All right. Then why did you say 150 rather than 160?

A. Because I had my coins in the drawer. See, I had the coins, right? And then I thought I had—I thought I didn't—I forgot I had the coins. And I thought they was in bills. (R. 23–24). (Underscoring supplied).

The record discloses that Lance Corporal S's testimony clearly establishes that he had

discovered his coins had not been stolen and that he had, therefore, revised his estimate of the amount of money stolen from him prior to the arrival of Sergeant C. It is clear then that the appellant's attack on the sufficiency of the evidence on this ground is contradicted by the evidence of record.

The only grounds for appellant's assignment of error are factual assertions in his own testimony and that of his witnesses, whose credibility was somewhat impaired. Their platoon sergeant stated that he would believe neither appellant nor Lance Corporal C under oath. (R. 70, 71). The appellant's other witness, Corporal M, admitted making a false official statement. (R. 44). Yet, to accept appellant's assignment of error that there is insufficient evidence to convict him beyond a reasonable doubt, this Court would have to believe appellant's testimony in favor of that of Sergeant C, who has no reason whatsoever not to tell the truth. He testified that when he searched appellant's person and found $14 in cash, appellant told him that that was all the money he possessed. When Sergeant C then discovered $150 in his locker, appellant explained that he had won the money shooting craps. (R. 60). Appellant contradicts that testimony by asserting that he told Sergeant C that he had merely said that he won the money gambling. Considering appellant's deceit in stating that he had no more money, and his contradiction of Sergeant C's testimony, we believe that appellant is unworthy of belief.

The facts remain in the record and before this Court that appellant had the opportunity to steal the money from Lance Corporal S. (W's testimony at R. 39–40). He was found in possession of the exact amount and denominations Lance Corporal S reported stolen, after lying that he had no more money. His explanation of the origin of the funds in his possession depends upon our belief of questionable witnesses and his explanation of how he obtained that sum of money. We turn now to that explanation.

Appellant claimed that out of his paycheck of $137.00 he deposited $68.00 in the credit union. There is no dispute as to this.

Appellant would then have had $69.00 left. Looking at it in a light most favorable to him, he would have had three twenty-dollar bills, one five-dollar bill and four one-dollar bills. He then stated he received a twenty-dollar bill in repayment of a loan to Corporal M. Lance Corporal C testified that he lost about $65.00 or $70.00 to appellant. If this is true, appellant would then have had seven twenty-dollar bills, and two five-dollar bills, and four one-dollar bills if he had won $65.00. If he had won $70.00, he would have had seven twenty-dollar bills, one ten-dollar bill, one five-dollar bill, and four one-dollar bills. Even if the above is believed, appellant still did not have two five-dollar bills (if he had won $65.00), nor one five-dollar bill (if he had won $70.00), but had only one ten-dollar bill.

Appellant's testimony was that: he had $69.00 left over from the credit union payment; he had $20.00 that Corporal M had repaid him; and he won around $73.00, receiving one twenty-dollar bill in the process. The rest he received at the end of the poker game. Since he received the remaining $53.00 after the alleged game, he could only have received two twenty-dollar bills, a ten or two fives perhaps, and three one-dollar bills. This still does not add up to the denominations of currency he was found with.

On the record, we are convinced beyond a reasonable doubt that appellant's guilt was proven beyond a reasonable doubt. The first assignment of error lacks merit.

Appellant's second assignment of error is: THE EXTENSIVE AND UNEXPLAINED DELAY IN THE PROCESSING AND REVIEW OF APPELLANT'S CASE AMOUNTS TO A DENIAL OF DUE PROCESS.

The appellant was tried and convicted of larceny under Article 121 of the Uniform Code of Military Justice before a special court-martial concluding on 21 November 1975. (R. 85). The convening authority acted upon the record of trial on 23 December 1975; however, the supervisory authority's review was not completed until 30 September 1976, 10 months after the conclusion of appellant's trial. The records and papers accompanying the record of trial contain no explanation why such an extraordinary delay occurred. In these circumstances, it cannot be gainsaid that the review of this case does not present a model of speed.

Although this was a contested trial, the record of trial is under 90 pages. The staff judge advocate's review is 15 pages, some of it containing "boilerplates," and there is nothing complicated about the case. In these circumstances, we find it deplorable that it took approximately 314 days before the supervisory authority's action was completed.

Appellant spent almost a year waiting for the review required by the *Manual for Courts-Martial* to be processed by reviewing authorities. The uncertainty surrounding the outcome of his court-martial would certainly have had a clear detrimental impact on his plans and actions during that year and would, appellant asserts, be sufficient to merit relief at this level. Appellant asserts that the relief required at this level is dismissal.

■ Due to the short duration of appellant's confinement, it is conceded by appellant that the speedy review presumption of *Dunlap v. Convening Authority*, 23 U.S.C.M.A. 135, 48 C.M.R. 751 (1974) is inapplicable. The appellant asserts, however, that the procrastination on the part of the supervisory authority in the instant case constitutes a denial of fundamental military due process and requires remedial action, to wit, dismissal. We can concede that the completely unexplained delay of almost one year in a most uncomplicated case goes far beyond the outer limits of acceptable procedure and is deplorable, but we cannot agree that the time involved here requires dismissal under the present state of the law. *United States v. Timmons*, 22 U.S.C.M.A. 226, 46 C.M.R. 226 (1973); *United States v. Gray*, 22 U.S.C.M.A. 443, 47 C.M.R. 484 (1973); *United States v. Jefferson*, 22 U.S. C.M.A. 554, 48 C.M.R. 39 (1973).

We would, however, issue a caveat that has already been sounded from the High

Military Court. In *United States v. Burns*, 25 U.S.C.M.A. 170, 54 C.M.R. 278, 2 M.J. 78 (1976), the principal opinion by Judge Cook held that "the accused was not prejudiced in any substantial right" by a delay of 447 days under the facts of that case.

In a concurring opinion, Judge Perry stated:

I, too, am vexed by the alarming, unexplained delay of 447 days between the completion of the appellant's trial and the action taken on the record thereof by the supervisory authority. It is incumbent upon all those who perform in critical roles in the administration of our judicial system to be aware of their responsibilities both to the system and to the individual military accused and to discharge those obligations as efficiently as possible. See Article 98, Uniform Code of Military Justice, 10 U.S.C. § 898. In this case, there is no reason either apparent or proffered for this inordinate delay.

Were this inattention to become a pattern, either with his particular commander or with the service generally, I would unhesitatingly join with our dissenting colleague in applying the drastic remedial step he now suggests. For the present, however, I believe that the standard found in the precedent of this Court for situations not invoking *Dunlap*, is fully adequate to meet the ends of justice in the interests of society and from the viewpoint of the accused. (Footnotes omitted). (Underscoring supplied).

We are fully cognizant of the personnel and funding constraints under which field commands operate. That, however, is not our province. Our province is to apply the law as we find it, now or in the future; and, it is all too clear that reviewing authorities must harken and attend to the words of Chief Judge Fletcher in his dissenting opinion in *Burns, supra*:

I recognize the precedent of the Court that the length of the post-trial delay alone does not entitle an accused to the remedy of dismissal. The Court has held, with reservations, that unless the appellant can demonstrate an error requiring a rehearing, and that he will be prejudiced in the presentation of his case on rehearing due to this delay or that no useful purpose would be served in further prolonging the proceedings, the conviction will be affirmed. (Citations omitted). Under the facts of this case, I feel the sanctioning by the Court of an unexplained, unjustified and unwarranted 447-day delay defeats the Congressional mandate for appellate review under the Uniform Code of Military Justice. I believe the remedy of dismissal is necessary to demonstrate the Court will not always permit the Government to delay the post-trial review of a case with impunity. Delays such as are present in this case only serve to thwart the total military justice system. (Footnotes omitted). (Underscoring supplied).

We are aware that convening and supervisory authorities undoubtedly give priority, and rightly so, to cases involving confinement in excess of 90 days so as to forestall triggering of the *Dunlap* rule. Nevertheless, other cases, which do not come under the penumbra of *Dunlap* but which involve punitive discharges, cannot be left on the "back burners", so to speak, indefinitely. This should be a warning beacon that repetition, in future cases, of the inordinate and unexplained delay demonstrated in this case will only serve to hasten the day when the high military court will find it necessary to establish another prophylactic rule for post-trial review in cases not covered by *Dunlap*. This will only serve to place further obstacles in the path of already overburdened field commands.

We would also add that, in an appropriate case where we do find prejudice from an inordinate and unexplained delay, we will not hesitate to dismiss, since such would be tantamount to a finding of denial of fundamental military due process. *See United States v. Chatman* No. 75 2838 (N.C. M.R. 18 November 1975), where Senior Judge Evans stated:

Were we to approve this slow processing, the appellate process would be an empty

ritual . . . we must in the interests of justice restore credibility in the appellate process by dismissing the instant charges.

 In the case *sub judice*, we find the delay in the processing of this uncomplicated case to be unacceptable. On the other hand, we find no substantial prejudice to appellant. On balance, we find the delay does not so offend our sense of fundamental fairness as to require dismissal, but we reassess the sentence and grant modest relief in view of the delay.

Accordingly, the findings and only so much of the sentence as approved below as provides for a bad conduct discharge, confinement at hard labor for 2 months, and reduction to pay grade E–1, are affirmed.

Senior Judge NEWTON and Judge GLADIS concur.